UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CORNERSTONE CHEMICAL COMPANY** | * | |
| | * | |
| **Plaintiff** | * | SECTION |
| | * | |
| **VERSUS** | * | |
| | * | |
| | * | |
| **FACTORY MUTUAL INSURANCE** | * | JUDGE |
| **COMPANY, HDI GLOBAL INSURANCE** | * | |
| **COMPANY, ACE AMERICAN INSURANCE** | * | |
| **COMPANY, ZURICH AMERICAN** | * | |
| **INSURANCE COMPANY. GENERAL** | * | |
| **SECURITY INDEMNITY COMPANY OF** | * | |
| **ARIZONA, HDI GLOBAL SPECIALTY, SE,** | * | MAGISTRATE |
| **AND HELVETIA SWISS INSURANCE** | * | |
| **COMPANY IN LIECHTENSTEIN, LTD** | * | |
| | * | |
| **Defendants** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMPLAINT FOR DECLARATORY JUDGMENT
AND FOR DAMAGES AND PENALTIES**

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Cornerstone Chemical Company (hereafter "Cornerstone" or "Plaintiff"), who submits its Complaint for Declaratory Judgment and for Damages and Penalties as follows:

**I.   PARTIES**

1.  Plaintiff, Cornerstone, is a Delaware corporation with its principal place of business within this judicial district in Jefferson Parish, Louisiana. Cornerstone is registered to do and doing business in the State of Louisiana.

2.  Made Defendants herein are the following insurance companies:

a. Factory Mutual Insurance Company ("FM Global"), a foreign (i.e., non-Louisiana) insurer identified by NAIC Code No. 21482, which is upon information and belief organized under the laws of the State of Rhode of Island with its principal place of business in that state. FM Global is registered with the Louisiana Commissioner of Insurance to conduct business in Louisiana and may be served through its registered agent for service: Joan A. Pelino.

b. HDI Global Insurance Company ("HDI"), a foreign insurer identified by NAIC Code No. 41343, which is upon information and belief organized under the laws of the State of Illinois with its principal place of business in that state. HDI is registered with the Louisiana Commissioner of Insurance to conduct business in Louisiana and may be served through the Louisiana Secretary of State. Pursuant to a Service of Suit endorsement contained in its policy, HDI may also be served by service of process upon Mendes and Mount, 750 Seventh Avenue, New York, NY, 10019-6829.

c. Ace American Insurance Company ("Ace"), a foreign insurer identified by NAIC Code No. 22667, which is upon information and belief organized under the laws of the State of Pennsylvania with its principal place of business in that state. Ace is registered with the Louisiana Commissioner of Insurance to conduct business in Louisiana and may be served through the Louisiana Secretary of State.

d. Zurich American Insurance Company ("Zurich"), a foreign insurer identified by NAIC Code No. 16535, which is upon information and belief organized under the laws of the State of New York with its principal place of business in that state. Zurich is registered with the Louisiana Commissioner of Insurance to conduct business in Louisiana and may be served through the Louisiana Secretary of State.

    e.  General Security Indemnity Company of Arizona ("SCOR") a foreign insurer, identified by NAIC Code No. 20559, which is upon information and belief organized under the laws of the State of Arizona with its principal place of business in that state. SCOR is registered with the Louisiana Commissioner of Insurance to conduct business in Louisiana and may be served through the Louisiana Secretary of State.

    f.  HDI Global Specialty SE ("Hanover"), licensed as an alien insurer (i.e., outside of the United States) identified by NAIC Code No. AA-1340041, which is upon information and belief organized under, and with its principal place of business, outside the United States. Hanover is registered with the Louisiana Commissioner of Insurance to conduct business in Louisiana and may be served through the Louisiana Secretary of State. Pursuant to a Service of Suit endorsement contained in its policy, HDI may also be served by service of process upon Mendes and Mount, 750 Seventh Avenue, New York, NY, 10019-6829.

    g.  Helvetia Swiss Insurance Company in Liechtenstein, Ltd. ("Helvetia"), licensed as an alien insurer identified by NAIC Code No. AA-1490002, which is upon information and belief organized under, and with its principal place of business, outside the United States. Helvetia is registered with the Louisiana Commissioner of Insurance to conduct business in Louisiana and may be served through the Louisiana Secretary of State. Pursuant to a Service of Suit endorsement contained in its policy, HDI may also be served by service of process upon Mendes and Mount, 750 Seventh Avenue, New York, NY, 10019-6829.

## II.  JURISDICTION AND VENUE

3.  As reflected above, there is complete diversity of citizenship pursuant to 28 U.S.C. § 1332 between the Plaintiff on the one hand and the Defendants on the other hand.

Further, the dispute and matter in controversy exceeds, exclusive of interest and costs, the sums specified by 28 U.S.C. § 1332.

4. In addition to the other relief requested herein, Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57. This Court has jurisdiction to decide such a claim as there is no other pending action addressing the insurance claims at issue, and the obligations with regard to which Plaintiff seeks declaratory relief are expressly set forth in an insurance policy issued by Defendants to Plaintiff, as set forth more fully below.

5. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because the insurance policy in dispute was issued and delivered in this judicial district insuring Plaintiff's property located in this judicial district. Further, as set forth above, Plaintiff's principal place of business is in this judicial district. Defendants have breached their insurance contracts to pay money to Plaintiff in Louisiana. By doing business in this judicial district through their contracts of insurance, Defendants have sufficient minimum contacts with Louisiana and in this district to afford this court jurisdiction and venue.

### III. FACTS CONCERNING ALLISION AND POLICY OF INSURANCE

6. On or about May 8, 2020, the M/V NOMADIC MILDE collided with the M/V ATLANTIC VENUS causing both vessels to become entangled in a "T" formation, near Cornerstone's marine facility on the right descending bank, Lower Mississippi River, near Waggaman, Louisiana ("Cornerstone's Dock").

7. During efforts to extricate the NOMADIC MILDE and ATLANTIC VENUS from each other, the NOMADIC MILDE allided with Cell No. 2 of Cornerstone's Dock (hereafter "the Allision"), causing extensive damage to Cornerstone's Dock and to other property of Cornerstone on or near Cell No. 2.

8. Cornerstone immediately undertook efforts to assess the damage resulting from the AllIsion, and particularly Cell No. 2, which Cornerstone utilized specifically for the purpose of handling and transferring acrylonitrile and sulfuric acid – products which require special handling because of their hazardous nature. The damage to Cell No. 2 and its appurtenant equipment and structures was so extensive that it rendered them completely inoperable for handling and transferring those products, requiring the replacement of that property and also requiring Cornerstone to incur certain costs, including but not limited to installing and leasing a spud barge next to the damaged Cell No. 2 as a temporary replacement of that facility.

9. Accordingly, Cornerstone entered into agreements for, among other things, (a) the repair and replacement of the Cell No. 2 and its appurtenant equipment and structures, (b) the leasing of a spud barge for handling and transferring of acrylonitrile and sulfuric acid pending such repair and replacement, and (c) utilization of a nearby terminal facility ("Stolthaven") to assist with the handling and transferring of acrylonitrile and sulfuric acid. Commencing shortly after May 8, 2020, Cornerstone has incurred significant costs associated with the damages incurred as a result of the Allision, including temporarily replacing the damaged property during the repair and replacement work.

10. At all applicable times, Cornerstone was the named insured on a certain Mutual Corporation Non-Assessable Policy of Insurance issued by FM Global, Policy No. 1065143 (the "Policy"), with a policy period of February 28, 2020 through February 28, 2021 at 12:01 a.m. The Policy provided coverage for, among other things, property damage to Cornerstone's property, which includes the Cornerstone Dock damaged in the above-described Allision.

11. The Policy contained a general limit of liability of $500 million for property damage, and various specified limits as may be described below. The Policy also contained a $5 million deductible for claimed property damage losses arising from a single occurrence.

12. In addition to the overall limit of liability for physical loss to property, the Property Damage section of the Policy reflects coverage for certain identified additional costs, with specified limits, as described below:

   a. Debris Removal - $50 million limit
   b. Expediting Costs - $50 million limit
   c. Claims Preparation Costs - $ 1 million limit
   d. Law and Ordinance - $50 million limit

13. By means of various insuring agreements, the other Defendants named herein (i.e., other than FM Global) acquired a 45% interest in the risks insured by the Policy, leaving FM Global with 55% of the risk. The applicable policy numbers and percentages of the risk acquired by the other Defendants are as follows:

   a. HDI; Policy No. CHD5556001 – 10%
   b. Ace; Policy No. EPRN14339292 – 10%
   c. Zurich; Policy No. OGR9172671-08 - 11.5%
   d. SCOR; Policy No. FA0039783-2020-1 - 6%
   e. Helvetia; Policy No. FA0039783-2020-1 – 4%
   f. Hanover: Policy No. PTNAM2004842 – 3.5%

Hereafter, the Defendants herein are sometimes jointly referred to as "the Insurers."[1]

14. By email dated May 11, 2020, Mark Ahlgrim on behalf of Cornerstone provided a "Property Claim Notice" to the various Defendants with regard to the Allision, advising that there was "severe IMPACT DAMAGE noted."

15. On June 29, 2020, Mr. Jacques A. Byrd, Plaintiff's Site Development Director, submitted a Sworn Proof of Loss (hereafter "Initial POL") to Defendants herein, which, among

---

[1] There are some differences between the FM Global policy and the policies of other defendants, such as certain limit amounts, which need not be referenced for purposes of this Complaint, but may result in different limits being applied to components of Cornerstone's claim.

other things, identified the following covered losses under the Policy's Property Damage section arising from and relating to the Allision:

    a. Physical loss to property $9,163,394.18
    b. Debris Removal $641,958.30
    c. Expediting Costs $3,632,881.41
    d. Claims Preparation Costs $75,249.05
    e. Containment Costs $81,045.47
    f. Law and Ordinance $3,665.73

In conjunction with the Initial POL, Cornerstone established a depository of documents supporting the losses that had been incurred by Cornerstone and/or represented amounts Cornerstone had committed to paying. Cornerstone has continued to update its depository of documents on a monthly basis, and has also provided responses to numerous inquiries from Defendants' representatives as to costs incurred and estimated as a result of the Allision.

16. The June 29, 2020 Initial POL stated that Cornerstone's evaluation and calculation of its losses was ongoing, and that this proof of loss, while complete and accurate when made, should be considered an initial proof of loss, subject to supplementation. Cornerstone reserved its right to supplement with additional proofs of loss as more information was obtained.

17. On or about July 27, 2021, Mr. Byrd on behalf of Cornerstone provided the Insurers with a Supplement to Sworn Proof of Loss (hereafter "Supplemental POL"), which identified the following covered losses:

    a. Physical loss to property $13,198,000.00 (of which $4,207,867.05 had been incurred as of June 30, 2021)
    b. Debris Removal $476,494.26
    c. Expediting Costs $10,498,705.76
    d. Claims Preparation Costs $102,698.75
    e. Containment Costs $77,841.98
    f. Law and Ordinance $25,167.00

18. Regarding the "Expediting Costs" element of loss, the Supplemental POL cited Item L in the Policy, under "PROPERTY DAMAGE; OTHER ADDITIONAL COVERAGES", as the provision providing coverage for that loss component. As set forth in Par. 7 of the Supplemental POL:

a. These are Cornerstone's reasonable and necessary costs not recoverable elsewhere in the Policy incurred for the temporary replacement of insured equipment suffering physical damage.

b. Prior to the Incident, the Cornerstone Marine Facility and its appurtenant loading, unloading, vapor recovery and related equipment used for waterborne receipt and/or delivery of acrylonitrile and sulfuric acid (collectively, "Cell 2") was used to load and unload acrylonitrile and sulfuric acid. Acrylonitrile manufactured at Cornerstone's plant was loaded onto ships and barges for delivery to customers. Sulfuric acid manufactured at the plant was loaded onto barges for delivery to customers. Additionally, sulfuric acid was unloaded from ships for use at Cornerstone's plant complex during times when Cornerstone's sulfuric acid plant was in turnaround or otherwise unable to supply the onsite need for sulfuric acid.

c. As a result of the Incident and the extensive damage sustained to Cell 2, Cornerstone was unable utilize the Cell 2 for loading and unloading acrylonitrile and sulfuric acid as described above.

d. Cornerstone has temporarily replaced Cell 2 pending completion and commissioning of Platform 2B by taking the following actions:

   i. Cornerstone installed and leases on an ongoing basis a spud barge, which is stationed next to Cell 2 and serves as a temporary platform for equipment needed to load and unload acrylonitrile and sulfuric acid to/from barges; however, due to the mooring arrangement of the spud barge and the condition of the damaged facility, there is not a suitable platform for safely berthing ships until Platform 2B is completed.

   ii. When the Incident occurred, Cornerstone's sulfuric acid plant had begun to shut down for a 30-day turnaround and Cornerstone had contracted firm commitments for two inbound ships to unload sulfuric acid for storage onsite as needed for use during the turnaround. Because the Incident rendered Cell 2 incapable of receiving those inbound acid ships, Cornerstone arranged to have the sulfuric acid lightered from the ships at Stolthaven's Braithwaite terminal and stored in barges leased from Carline and fleeted in Carline's Luling Fleet and transferred into tanks leased from Stolthaven. Once temporary transfer capabilities were established at the Cornerstone dock utilizing the spud barge leased from Stewart Construction, the

      loaded barges were towed from Carline's fleet to Cornerstone and unloaded into onsite storage. The empty barges were then towed to Stolthaven to transfer the acid stored in the leased shore tanks onto the barges, which were then towed to Cornerstone for transfer of the product across the spud barge into onsite storage.

iii. By regulation, Cornerstone must capture any vapors emitted during acrylonitrile cargo operations and route those vapors back to a tank. This is accomplished using a certified piece of equipment called a vapor control system (VCS). Cornerstone had the VCS that had been located on Cell 2 moved to and certified for use on the spud barge so acrylonitrile could be loaded from the spud barge onto barges in compliance with applicable regulations.

iv. Cornerstone also installed on the spud barge other equipment and hoses necessary to conduct acrylonitrile and sulfuric acid cargo transfers from the spud barge to/from barges.

v. To replace the lost capability of Cell 2 as a facility to load acrylonitrile onto ships as needed to fill customer orders, Cornerstone leases barges and related towing services so acrylonitrile can be loaded onto barges at the spud barge and towed to Stolthaven where the acrylonitrile cargo is "shorelooped" through Stolthaven VCS and loaded onto ships. This operation involves additional tankerman services to load vessels at Stolthaven. Acrylonitrile barges unloaded at Stolthaven are then returned to the spud barge or fleeted until they are needed again. Cornerstone also leased an acrylonitrile tank from Stolthaven to enable Cornerstone to store acrylonitrile for eventual loading onto ships at the Stolthaven terminal.

vi. Cornerstone's claim for recoverable Expediting Costs includes costs for equipment and/or services from [below listed] providers and any other vendors now or hereafter providing equipment and/or services relating to the spud barge or Stolt shorelooping operations.

19. On September 27, 2021, adjustors from Sedgwick on behalf of the Insurers issued a formal Reservation of Rights letter, in which the Insurers, in large measure, took the position that they needed more time or more information to evaluate the components of Cornerstone's Supplemental POL, notwithstanding the fact that Cornerstone had been updating its document depository on a monthly basis and responded to numerous questions posed by Insurers' representatives.

20.     Thereafter, by letter dated November 22, 2021, the Sedgwick adjustors on behalf of the Insurers notified Cornerstone that it disputed the Expediting Costs component of the Supplemental POL. More specifically, they advised that they deemed the sum of $7,697,818 (a) for costs incurred for fleeting of materials, and (b) for costs incurred at the downriver Stolthaven dock to constitute "Extra Expenses under the Time Element coverage of the Policy", rather than Expediting Costs under "PROPERTY DAMAGE; OTHER ADDITIONAL COVERAGES", as claimed by Cornerstone.

21.     Further letters regarding the "Expediting Costs" issue referenced above were exchanged in December 2021 (from counsel for Cornerstone) and January 2022 (from the Sedgwick adjustors); nevertheless, the Insurers have continued to refuse to recognize that the cost components referenced in Paragraph 20 above are covered as Expediting Costs under the Policy. As set forth in Sedgwick's letter dated January 22, 2022, the amount which Defendants refused to recognize as Expediting Costs at that time was $7,868,126, which amount has increased and continues to increase as additional costs are incurred.

22.     As referenced herein, the Property Damage section of the Policy contains, among various "Additional Coverages", the following relevant provision:

    **L.**     **EXPEDITING COSTS**

    This Policy covers the reasonable and necessary costs incurred:

    1) for the temporary repair of insured physical damage to insured property;

    2) for the temporary replacement of insured equipment suffering insured physical damage; and

    3) to expedite the permanent repair or replacement of such damaged property.

    This additional coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

The Expediting Costs coverage is subject to its own $50 million limit.

23. Cornerstone maintains that (a) the various elements of loss identified as Expediting Costs in its Supplemental POL, including those disputed by Defendants, meet the criteria for coverage under Subpart L of the Property Damage section of the Policy, for the reasons set forth in Paragraph 7 of the Supplemental POL, and (b) the costs identified by Cornerstone as Expediting Costs, including the disputed costs, are not recoverable elsewhere in the Policy.

24. Cornerstone further maintains that the Insurers' position that costs incurred for fleeting of materials and at the downriver Stolthaven dock should be deemed "Extra Expenses" under the Time Element coverage of the Policy is without merit.

25. Cornerstone avers that it has properly submitted its proofs of loss and otherwise made demand against the Insurers (Defendants herein) and have fully cooperated with the investigation made by Defendants' representatives in accordance with the terms of the Policy and applicable law.

26. Upon information and belief, the only coverage dispute between Cornerstone and Defendants relating to the Allision concerns the certain costs among those claimed by Cornerstone as "Expediting Costs" which Defendants dispute, as described above. However, because other loss components identified herein have not been completely adjudicated and paid, Cornerstone reserves its rights to seek any and all necessary relief and remedies with regard to any claim components which are not yet resolved.

27. To the extent there is any issue as to its demand, Cornerstone hereby makes demand and seeks recovery of all loss amounts which it has incurred or will incur as a result of the Allision described herein that are covered under the Property Damage section of the Policy.

## IV. FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT

28. Cornerstone re-avers and re-alleges each of the foregoing paragraphs as if set forth herein *in extenso*.

29. The Property Damage provisions of Defendants' Policy obligate Defendants to provide coverage and pay claimed losses to Cornerstone resulting from the above-described Allision pursuant to its various terms, including coverage for physical damage to property, debris removal, expediting costs, claim preparation costs, containment costs, and law and ordinance costs.

30. Under 28 U.S.C. § 2201, Cornerstone is entitled to a declaratory judgment declaring that pursuant to the terms of the Policy, it has the right to recover all properly submitted loss amounts relating to the claim components identified above.

31. Upon information and belief, with the exception of certain losses claimed as Expediting Costs, Defendants do not challenge coverage under the Policy as to any of Cornerstone's loss components except for the Expediting Costs claim, as described above. Assuming that to be the case, Cornerstone's claim for declaratory relief is limited to its claim for Expediting Costs, and as to that claim component, Cornerstone is entitled to a judgment declaring that the costs identified in its Supplemental POL as Expediting Costs – as those costs may be supplemented and/or amended over time - are in fact covered as such pursuant to the terms of the Property Damage section of the Policy.

32. While Cornerstone avers that the wording of the Policy clearly supports its position that the costs identified in its Supplemental POL meet the criteria to be deemed Expediting Costs, any ambiguity in the terms of the Policy or between conflicting Policy

provisions must be construed against the Defendants, who are deemed the drafter(s) of the Policy.

33. Declaratory relief is available herein because there is no pending case in which this issue may be adjudicated.

34. As set forth above, Cornerstone reserves the right to seek additional declaratory relief, as necessary, in the event that Defendants dispute any other components of Cornerstone's claim, or seek to impose limits or deductibles that are not warranted under the Policy, arising from Cornerstone's tendered proofs of loss as those may be supplemented and/or amended.

### V. SECOND CAUSE OF ACTION: BREACH OF CONTRACT

35. Cornerstone realleges and reavers each and every allegation set forth above.

36. The Policy provides coverage for the losses resulting from the Allision as described herein. As such, Defendants' denial of coverage and refusal to pay the amount of Cornerstone's claim for Expediting Costs (minus any applicable deductible) is a breach of the parties' insurance contract and contrary to applicable Louisiana law.

37. Similarly, in the event the Defendants dispute and refuse to pay any other claim amounts arising from Cornerstone's tendered proofs of loss, as those may be supplemented and/or amended, or seek to impose limits or deductibles that are not warranted under the Policy, any such action constitutes breach of the parties' insurance contract and is contrary to applicable Louisiana law.

38. Accordingly, Defendants are liable to Cornerstone for all damages and losses incurred as a result of Defendants' breach of the insurance contract.

### VI. THIRD CAUSE OF ACTION - PENALTIES AND ATTORNEY'S FEES

39. Cornerstone realleges and reavers each and every allegation set forth above.

40. In addition to the losses and damages set forth above, Defendants violated their legal and statutory obligations to their insured by denying coverage concerning the Expediting Costs claim component of Cornerstone's property damage claim. Accordingly, Defendants are liable to Cornerstone for penalties and attorney's fees as provided for in La. R.S. 22:1892 and/or La. R.S. 22:1973.

41. At all times, Cornerstone has cooperated fully with Defendants and their adjusters in their investigation of the claim and has provided all requested information and sufficient proofs of loss regarding the losses claimed herein. As set forth above, Cornerstone has supplemented its document depository on a monthly basis with documents supporting its claims arising from the Allision as such documents have become available.

42. Notwithstanding the foregoing, Defendants have arbitrarily, capriciously and without probable cause denied coverage and refused to pay certain losses owed under the Expediting Costs provision of the Policy within thirty (30) days in violation of La. R.S. 22:1892(B)(1), rendering Defendants liable for penalties and attorney's fees as provided by that statute.

43. Further, Defendants arbitrarily, capriciously and without probable cause denied coverage and have failed to pay certain losses owed under the Expediting Costs provision of the Policy within sixty (60) days in violation of La. R.S. 22:1973(B)(6), rendering Defendants liable for penalties as provided by that statute.

44. As more fully set forth below, Defendants' denial of coverage and refusal to pay Cornerstone for losses covered by the "Expediting Costs" provision of the Property Damage section of the Policy is based on its (a) self-serving interpretations of the Policy, and (b) erroneous interpretation of applicable law.

45. In contending that the losses at issue constitute "Extra Expenses" under the Time Element coverage of the Policy, Defendants are well aware that the large deductible applicable to the Time Element section of the Policy would result in no recovery to Cornerstone for the losses in dispute.

46. While Cornerstone maintains that the losses in dispute are covered by the Expediting Costs coverage provision within the Property Damage section of the Policy, if such is not clearly the case, then the two conflicting policy provisions constitute a patent ambiguity within the Policy, which ambiguity must be construed in Cornerstone's favor.

47. Further, under applicable law, the Defendants are charged with the knowledge that ambiguous policy provisions are to be construed against them, with the result being that their denial of coverage of the disputed costs at issue based on their erroneous interpretation of ambiguous policy provisions is deemed without probable cause and grounds for the penalties requested herein. *See Gulf Oil Corp v The Mobile Drilling Barge or Vessel Margaret,* 441 F. Supp. 1 (E.D. La. 1975), aff'd 565 F. 2d 958 (5th Cir. 1978).

48. For the foregoing reasons, Defendants are liable to Cornerstone for penalties and attorney's fees as provided for in La. R.S. 22:1892 and/or La. R.S. 22:1973.

49. Cornerstone reserves the right to seek applicable penalties against Defendants pursuant to the above-referenced statutes for any subsequent acts or omissions relating to the Allision which may give rise to the imposition of such relief.

### JURY DEMAND

50. Cornerstone requests and is entitled to a trial by jury on the matters asserted herein.

**WHEREFORE**, Plaintiff, Cornerstone Chemical Company, prays that:

Defendants be served with a copy of this Complaint and be cited to appear and answer Plaintiff's Complaint, and after legal delays and proceedings, that there be judgment herein in favor of Plaintiff and against Defendants as follows:

(a) for declaratory judgment as prayed for herein;

(b) for a judgment that Defendants breached their policies of insurance, and that Plaintiff is entitled to recover all losses it has incurred resulting from the Allision described herein that are recoverable under the Policy, in an amount to be determined at trial, with each Defendant liable for its share of the loss consistent with its proportionate share of the risks insured, plus the costs of the proceedings and interest on any award; and

(c) for a judgment that Defendants have violated Louisiana law in the manner in which they adjusted and refused to recognize Plaintiff's claim, thereby entitling Plaintiff to an award of all applicable penalties, attorney's fees, and other damages to which Plaintiff is entitled pursuant to La. R.S. 22:1892 and/or 22:1973.

Plaintiff expressly reserves all rights under the Policy and further prays for any and other general, equitable and specific relief to which it may be entitled.

Respectfully submitted,

/s/ Robert J. Stefani
ROBERT J. STEFANI (#19248)
ROBERT J. BURVANT (#14119)
DIANA J. MASTERS (#37372)
**KING & JURGENS, L.L.C.**
201 St. Charles Avenue, Suite 4500
New Orleans Louisiana 70170
Telephone: (504) 582-3800
Facsimile: (504) 582-1233
rstefani@kingjurgens.com
rburvant@kingjurgens.com
dmasters@kingjurgens.com
*Attorneys for Plaintiff, Cornerstone Chemical Company*